# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ELEVACITY U.S., LLC | § | |
| d/b/a THE HAPPY CO.  f/k/a | § | |
| ELEPENEURS U.S., LLC d/b/a | § | |
| ELEPRENEURS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No.  4:22-CV-00042 |
| v. | § | Judge Mazzant |
| | § | |
| BRIAN CHRISTOPHER SCHWEDA, JR., | § | |
| | | |
| *Defendant* | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant's 12(b)(2) Motion to Dismiss (Dkt. #6).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

## BACKGROUND

This case arises out of the business relationship between Plaintiff Elevacity U.S., LLC d/b/a The Happy Co., f/k/a Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC ("Elevacity") and Defendant Brian Christopher Schweda, Jr. ("Schweda").  Elevacity is a Texas limited liability company with its principal office in Plano, Collin County, Texas (Dkt. #1 ¶ 2).  Elevacity sells and markets "various health, wellness and happiness products and services through a direct sales community of independent contractors[,]" also known as distributors or brand partners (Dkt. #1 ¶ 8).  Elevacity's distributors market and sell the company's products and "recruit additional individuals into the Elevacity Distributor system to further promote and sell products and services to" potential customers (Dkt. #1 ¶ 9).  Schweda is a Louisiana resident who is a former Elevacity distributor.

I.     **Schweda Joins Elevacity and Agrees to Elevacity's Agreements**

In 2017, Schweda joined Elevacity's business as a distributor (Dkt. #1 at p. 4).  On October 4, 2018, Schweda agreed to and accepted three essential documents (pursuant to an electronic verification system process) governing his work with Elevacity: (i) the Elepreneur Agreement; (ii) the Policies and Procedures of Eleprenuers LLC, and (iii) the Elepreneurs Social Media and Online Policy Guide (collectively the "Prior Agreements") (Dkt. #1 ¶ 13).  To accept and agree to the Prior Agreements, distributors, including Schweda, underwent the following standard process: (i) logging in to the Elevacity computer system to access the distributor's "Back-Office"[1]; (ii) reading the Prior Agreements; and (iii) manually agreeing to the Prior Agreements by clicking the mouse to place a check-mark in a box accepting all of the terms and conditions of the Prior Agreements  (Dkt. #1 ¶ 14).  If a distributor did not complete this process, that distributor would not be able to proceed to access their Back-Office  (Dkt. #1 ¶ 14).

**A. The Prior Agreements Are Amended**

The Policies and Procedures of Elepreneurs, LLC stated that "Amendments and changes will be communicated to Elepreneurs through official Company publications, including posting on the website or by electronic mail. Amendments are effective and binding on all Elepreneurs five days after publication" (Dkt. #1, Exhibit 2 at p. 36).  According to Elevacity, it "considered 'posting on 'the website or by electronic mail'' to include posting to a distributor's Back-Office" (Dkt. #1 ¶ 15).  In 2021, Elevacity posted its Independent Brand Partner Agreement and Policies and Procedures (collectively, the "Amended Agreements") to its distributors' Back-Offices (Dkt. #1 ¶ 17).  However, according to Schweda, the Amended Agreements were placed in a

---

[1] At Elevacity, Back-Office is the primary portal for distributors to order more product and keep track of sales figures (Dkt. #1 ¶ 14).

remote section of Back-Office and nothing in Back-Office informed distributors that the agreements were amended (Dkt. #6, Exhibit 1 ¶¶ 18–19).  Further, according to Schweda, Elevacity never "communicated" to him that the Prior Agreements were revised (Dkt. #6, Exhibit 1 ¶ 8).  For instance, Elevacity never sent him an email, alert, or any other type of notification that informed him that the documents had been amended (Dkt. #6, Exhibit 1 ¶ 8).

The Amended Agreements contain various provisions stating that Elevacity's distributors (i) cannot solicit other distributors to leave Elevacity or otherwise terminate their relationship with Elevacity, (ii) use a social media site to draw inquiries from other distributors about a new network marketing company, or (iii) disparage Elevacity by making negative comments (Dkt. #1 ¶ 19).  For example, under Section 12 of the Independent Brand Partner Agreement, distributors are prohibited, while they are distributors for Elevacity and for twelve months afterward, from recruiting any other Elevacity distributor for any other direct selling or network marketing business (Dkt. #1, Exhibit 5 ¶ 12).  Under the Agreement, "recruiting" includes: (i) "communicating information or offering to provide information about another direct selling, network marketing, or social selling business" to another Elevacity distributor; (ii) "posting or messaging information" about such a company on a social media site the distributor has also used to promote their Elevacity business; (iii) or "tagging" other Elevacity distributors in such posts (Dkt. #1, Exhibit 5 ¶ 12).  Additionally, during this same term, distributors may not use such social media accounts in any way that may "reasonably be foreseen" to draw inquiries from other Elevacity distributors to other direct selling or network marketing businesses or products (Dkt. #1, Exhibit 5 ¶ 12).

Further, the Independent Brand Partner Agreement, like the Prior Agreements, references Texas in several provisions.  For example, Section 16 of the Independent Brand Partner Agreement provides:

> This Agreement shall be governed by the laws of the State of Texas without reference to its conflict of laws rules.  Except as set forth in the P&P, all claims and disputes relating to this Agreement, the rights and obligations of the parties, or any other claims or causes of actions relating to the performance of either party under this Agreement and/or Brand Partner's purchase of products shall be settled totally and finally by arbitration in Collin County, Texas, in accordance with the Federal Arbitration Act and the Commercial Rules of the American Arbitration Provision

(Dkt. #1, Exhibit 5 ¶ 16).  Further, the notice provision in Section 18 ties the definition of "business day" to a legal holiday in the State of Texas (Dkt. #1, Exhibit 5 ¶  16).

## B. Schweda's Work with Elevacity and Subsequent Resignation from the Company

After enrolling as a distributor for Elevacity, Schweda operated his distributorship in Louisiana (Dkt. #6, Exhibit 1 at p. 2).  Schweda allegedly used his Facebook page to conduct his business—both marketing Elevacity products and recruiting additional distributors through the platform (Dkt. #1 ¶ 18).  Further, as part of his work, Schweda recruited a significant number of individuals into the Elevacity distributor system to work in his "down-line" and grew that "down-line" (Dkt. #13 at p. 5).  The two biggest distributors in Schweda's "down-line" are Texas residents, Ricky Durant ("Durant") and Ian Prather ("Prather") (Dkt. #13 at p. 5).  However, according to Schweda, he did not direct any marketing efforts to Texas residents or solicit Texas residents to join Elevacity (Dkt. #6, Exhibit 1 at p. 2).[2]

Schweda operated his distributorship with Elevacity until December 17, 2021, the date on which he resigned (Dkt. #1 ¶ 20).  Following Schweda's resignation, Schweda allegedly began marketing and promoting different products, including an "energizing" coffee product, on social

---

[2] According to Elevacity, however, Schweda personally recruited Durant as a distributor (Dkt. #13 at p. 5).  To support this proposition, Elevacity provides a declaration from David Litt ("Litt"), the Vice President of Digital Strategy for Elevacity (Dkt. #13, Exhibit B).  According to Litt, "Mr. Schweda recruited Ricky Durant to become one of Mr. Schweda's down-line Distributors from whom Mr. Schweda would receive compensation from sales made by Ricky Durant" (Dkt. #13, Exhibit B ¶ 6).  In response, Schweda argues that Litt's declaration is "[f]alse" and "relies on inadmissible hearsay which lacks any foundation whatsoever" (Dkt. #15 at p. 7).  More specifically, Schweda contends that "Litt provides absolutely no foundation explaining how he knows Mr. Schweda 'recruited' Mr. Durant, " and, thus, "the evidence regarding Mr. Durant is inadmissible, inaccurate, and should be ignored" (Dkt. #15 at pp. 7–8).

media (Dkt. #1 ¶ 21).   More specifically, Elevacity alleges that Schweda made a variety of Facebook posts, which were aimed at promoting his new marketing venture (Dkt. #1 ¶ 27). Further, according to Elevacity, former Elevacity distributors—some of which are Texas residents—commented on the posts and joined Schweda's new venture (Dkt. #1 ¶¶ 22–27). However, according to Schweda, his Facebook page is accessible to all persons who have Facebook, and the posts were not directly sent to any Texas residents (Dkt. #6, Exhibit 1 ¶¶ 12– 13).

On January 20, 2022, Elevacity filed suit against Schweda, asserting claims for breach of contract and tortious interference with existing contracts (Dkt. #1).   On February 23, 2022, Schweda filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction (Dkt. #6).   On March 29, 2022, Elevacity filed a response to the motion to dismiss, requesting jurisdictional discovery in the event there is any doubt as to jurisdiction over Schweda (Dkt. #13).   On April 5, 2022, Schweda filed a reply (Dkt. #15).   On April 13, 2022, Elevacity filed a sur-reply (Dkt. #19). On June 29, 2022, the Court granted Elevacity's request for jurisdictional discovery (Dkt. #23). On August 12, 2022, after conducting jurisdictional discovery, Elevacity filed a supplemental jurisdictional brief (Dkt. #24).   On August 16, 2022, Schweda responded to Elevacity's jurisdictional brief (Dkt. #25).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant.   FED. R. CIV. P. 12(b)(2).   After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 202 (5th Cir. 1989)).

5

To satisfy that burden, the party seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d 681, 683 n.3 (5th Cir. 1977). Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 161, 1067 (5th Cir. 1992)). However, if a court holds an evidentiary hearing, a plaintiff "must establish jurisdiction by a preponderance of the admissible evidence." *In re Chinese Manufactured Drywall Prods. Liab. Lit.*, 742 F.3d 576, 585 (5th Cir. 2014) (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008)).

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cinega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution.

The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir.

6

1992).   Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees.   *Bullion*, 895 F.2d at 216.   The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice."   *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).   Minimum contacts with a forum state can be satisfied by contacts that give rise to either general jurisdiction or specific jurisdiction.   *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

## ANALYSIS

Schweda asserts that the Court should dismiss Elevacity's claims under Federal Rule of Civil Procedure 12(b)(2) because he is not subject to personal jurisdiction in Texas (Dkt. #6).   In response, Elevacity concedes that the Court lacks general jurisdiction as to Schweda (Dkt. #13 at p. 7 n.2).   The Court agrees.   Therefore, the Court will only address whether it has specific jurisdiction over Schweda.

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state.   *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).   For the court to exercise specific jurisdiction, the court must determine "(1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."   *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).   "Because 'specific personal jurisdiction is a claim-

specific inquiry,' '[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim.'" *Inmar Rx Sols., Inc. v. Devos, Ltd.*, No. 18-11443, 2019 WL 4440400, at *3 (5th Cir. Sept. 16, 2019) (quoting *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)).

Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King*, 471 U.S. at 475 (citing *Travelers Health Assoc. v. Va.*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.*

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477. "It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin*, 587 F.3d at 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

Here, Elevacity has asserted both a breach of contract and tortious interference claim against Schweda (Dkt. #1). Both causes of action arise from the same or similar alleged facts: Schweda became an Elevacity distributor while knowing the company was a Texas entity, allegedly entered into to the Amended Agreements, and then allegedly violated them by posting

8

impermissible content on Facebook.  Nevertheless, the Court analyzes the breach of contract and tort claims separately because the minimum-contacts test differs[3] for the claims, and both parties considered each separately. *See Trois v. Apple Tree Auction Center, Inc*., 882 F.3d 485, 490 (5th Cir. 2018) ("Importantly, the minimum-contacts test for personal jurisdiction in fraud differs from that in contract."); *see also Danziger*, 24 F. 4th at 495–500 (5th Cir. 2022) (analyzing personal jurisdiction for intentional tort claims and breach of contract claims separately).

## I.      Tortious Interference with Existing Contracts

Elevacity asserts a tortious interference claim against Schweda, alleging that Schweda willfully and intentionally interfered with Elevacity's contracts with its distributors by soliciting them to work for his competing company (Dkt. #1).  In support of its tortious interference claim, Elevacity alleges that Schweda posted about a competing business on his Facebook page and then some of Elevacity's distributors responded to the posts (Dkt. #1).  More specifically, according to Elevacity, Schweda "tortiously interfered with contracts that [he] knew or should have known involved substantial Texas connections and that would cause injury in Texas" (Dkt. #13 at p. 12).

Thus, Elevacity argues that the Court has personal jurisdiction over Schweda for its tortious interference claim "[b]ecause [Schweda]'s tortious conduct was directed toward Texas and caused significant harm in Texas" (Dkt. #13 at p. 11).  Further, Elevacity points out that Schweda's two biggest down-line distributors live in Texas and that Schweda earned almost $500,000 based on

---

[3] For example, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014).  Thus, "[t]he proper focus of the 'minimum contacts' inquiry in intentional-tort cases is the relationship among the defendant, the forum, and the litigation." *Id*. at 291 (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).  By contrast, "[w]hen determining whether a court has personal jurisdiction over a breach of contract claim, 'only those acts which relate to the formation of the contract and the subsequent breach are relevant,' including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C*., 24 F. 4th 491, 500 (5th Cir. 2022) (citing *Trois*, 882 F,3d at 489)).  Thus, because the minimum contacts test for tort cases and breach of contract cases has different considerations, the contacts examined in each will invariably be different.

their sales efforts in 2020 and 2021, which indicate both that Schweda "should have know[n] the effect his actions would have in Texas" and "the extent to which [Schweda]'s actions can have an effect on [Elevacity]'s business in Texas" (Dkt. #13 at p. 13).  Additionally, according to Elevacity, even "[m]ore telling" is that Schweda's "Facebook postings . . . were seen by Texas distributors" (Dkt. #13 at p. 13).  In response, Schweda contends that his Facebook posts are insufficient to establish the required contacts for Elevacity's tort claim because (i) the posts were made on a public webpage accessible to anyone who has a Facebook page, not just Texas residents; (ii) Schweda did not place limitations on the posts so they could only be viewed by Texas residents; (iii) there is no evidence of targeted advertising on Schweda's Facebook page to Texas residents; (iv) the posts mention nothing about Texas residents; and (v) the posts were not sent through private messaging to Texas residents (Dkt. #6 at pp. 6–7).

The Fifth Circuit has repeatedly held that "mere allegations of tortious interference with a forum resident's contractual rights are not sufficient to establish specific personal jurisdiction." *Cent. Freight Lines v. APA Transp. Corp.*, 322 F.3d 376, 383 (5th Cir. 2003).  Further, in intentional tort cases, "it is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff." *Danziger*, 24 F. 4th at 495 (internal quotations omitted).  Instead, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286 (citation omitted).  Thus, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Danziger*, 24 F. 4th at 497.

To support their respective arguments, Elevacity and Schweda rely on factually different Fifth Circuit cases.  On the one hand, Elevacity contends this case is similar to *Central Freight*

*Lines*, a case that involved a New Jersey-based freight carrier's alleged interference with a contract between the plaintiff, a Texas-based freight carrier, and Dell Computers, a Texas-based computer manufacturer. *See* 322 F.3d at 384.  In holding the New Jersey-based freight carrier was subject to personal jurisdiction in Texas, the Fifth Circuit emphasized that the New Jersey-based carrier knew about the plaintiff's relationship with Dell, another Texas entity, and that the defendant "intentionally attempted to interfere with that relationship by holding Dell freight hostage . . . and manipulating the price of freight delivery in the northeast." *Id*.  Thus, the Fifth Circuit found that the plaintiff had pleaded facts that were sufficient to show that the defendant committed intentional torts that were purposefully directed at plaintiff's contractual relationship with another Texas entity. *Id*. at 383–84.  Further, according to the Fifth Circuit, because Texas was both the plaintiff's "home state" and the "primary location" of the business dealings of the two Texas-based companies, it was not a "mere fortuity" that the plaintiff suffered injury in Texas. *Id*. at 384. Consequently, Elevacity asserts this case is like *Central Freight Lines* because it "alleges that [Schweda] tortiously interfered with contracts that it knew or should have known involved substantial Texas connections and that would cause injury in Texas" (Dkt. #13 at p. 12).

By contrast, Schweda argues that *Admar International Inc. v. Eastock, L.L.C*., 18 F.4th 783 (5th Cir. 2021), applies here.  In *Admar*, the Fifth Circuit held that the mere fact that Louisiana residents could access a defendant's website in Louisiana was insufficient to create minimum contacts necessary for personal jurisdiction. 18 F.4th at 787.  More specifically, in the case, plaintiffs, companies in the baby products business, brought an action in Louisiana against a Wisconsin-based competitor, alleging that the defendant committed copyright and trade dress infringement by displaying copies of plaintiffs' products on its website. *Id*. at 785.  Though the accused products were available on defendant's website, the Fifth Circuit found it significant that

11

there was no "evidence that [defendant]'s website specifically target[ed] Louisiana"—defendant "ha[d] not sold a single accused product to a Louisiana resident, and it [had] solicite[d] no business there through targeted advertising." *Id*. at 787.   Thus, relying on *Admar*, Schweda asserts that "[a]lthough [his] public Facebook website was accessible to the world, including persons [that] lived in Texas, that is not enough to establish jurisdiction" (Dkt. #15 at p. 6).   Instead, according to Schweda, Elevacity "must show Schweda actually 'targeted' persons residing in Texas through his Facebook website" (Dkt. #15 at p. 6).

Because Elevacity's tortious interference claim is based on Schweda's Facebook posts, it is arguable that *Admar*—which dealt with Internet-based contacts—is closer to the facts at hand. That said, *Central Freight Lines* involved a tortious interference claim—the specific claim at issue here.   While on the one hand, *Central Freight Lines* involves traditional contacts and arguably supports a finding of personal jurisdiction here, on the other hand, *Admar* involves Internet contacts and supports a lack of personal jurisdiction.   Nevertheless, the cases can be harmonized.

In both *Central Freight Lines* and *Admar*, the Fifth Circuit, as with other intentional tort cases, focused its inquiry on whether the plaintiff had pleaded facts that showed the defendant had purposefully directed its intentionally tortious conduct toward the forum state. *Cf. Central Freight Lines*, 322 F.3d at 383–84 ("[W]e find that [plaintiff] has pled facts that are sufficient to show [defendant] committed intentional torts that were purposefully directed at [plaintiff's] contractual business relationship with another Texas entity."), *with Admar*, 18 F.4th at 787 ("Missing here is any evidence that [defendant]'s website specifically targets Louisiana.").   For example, in *Central Freight Lines*, plaintiff alleged the defendant knew of Texas-based plaintiff's contractual relationship with Dell, another Texas-based entity, and that defendant took specific action to interfere with it by holding Dell's freight hostage. 322 F.3d at 383.   Thus, defendant's tortious

12

conduct—though entailing the holding of freight hostage located in New Jersey—was purposefully directed toward Texas because it was specifically aimed at interfering with the contractual relationship of two Texas-based companies whose business dealings were based in Texas. *Id.* at 384. Similarly, in *Admar*, the Fifth Circuit found that the defendant did not have minimum contacts with Louisiana because there was no evidence that the defendant targeted the forum state by purposefully availing itself of the opportunity to do business in that state. 18 F.4th at 787. Thus, the key is whether Schweda targeted Texas.

Accordingly, equipped with the proper focus, it becomes clearer that Schweda's comparison of the case at hand to *Admar* is more fitting than Elevacity's comparison to *Central Freight Lines*. Indeed, though Elevacity contends this case is like *Central Freight Lines* because it "alleges that [Schweda] tortiously interfered with contracts that it knew or should have known involved substantial Texas connections and that would cause injury in Texas," (Dkt. #13 at p. 12), missing from Elevacity's argument is how or in what way Schweda purposefully directed his allegedly intentionally tortious conduct toward Texas. To be sure, while the Fifth Circuit in *Central Freight Lines* held that the defendant's awareness of a Texas-based plaintiff's contractual relationship with another Texas-based entity, combined with the defendant's later tortious actions directed at that other Texas-based entity, indicated that the defendant's intentional torts were purposefully directed at Texas, the same cannot be said here. Here, Elevacity has failed to show how Schweda's tortious actions were purposefully directed at Texas.

Indeed, though Schweda's Facebook posts are the basis for Elevacity's tortious interference claim against Schweda, the posts are not connected to Texas in any way. Schweda made the posts on a public webpage that is accessible to all persons who have Facebook—not just Texas residents. Likewise, the posts were never sent directly to any Texas residents through

13

private messaging.  Further, the posts mention nothing about Texas residents or even anything Texas-related.  And Schweda does no targeted advertising on his Facebook page to Texas residents.  Thus, like *Admar*, "missing here is any evidence that [Schweda]'s [Facebook] web[page] specifically target[ed] [Texas]." 18 F. 4th at 787.  Further, unlike *Central Freight Lines*, where the facts showed that the defendant had allegedly committed intentional torts that were purposefully directed at plaintiff's business relationship with another Texas entity, here, Schweda's posts—the basis of the alleged torts—were not purposefully directed at any Texas residents.  Indeed, the posts were accessible to all people who have Facebook—they were not sent directly to any Texas residents through private messaging.  Thus, because Schweda's allegedly tortious conduct did not target Texas, the Court lacks personal jurisdiction.

Nevertheless, Elevacity attempts to distinguish *Admar*, arguing that the facts here are dissimilar.  In doing so, Elevacity relies on a quoted passage from *Admar*, which states:

> [A] defendant does not have sufficient minimum contacts with a forum state just because its website is accessible there. The defendant must also target the forum state by purposefully availing itself of the opportunity to do business in that state. And here, there is no evidence that [defendant] targets Louisiana: [Defendant] has not sold a single accused product to a Louisiana resident, and it solicits no business there through targeted advertising.

18 F. 4th at 787.  Thus, according to Elevacity, this case is different from *Admar* because, unlike the defendant in *Admar*, "given the magnitude of Texas business in [Schweda]'s down-line, [Schweda] cannot credibly claim he has not purposefully availed himself of the opportunity to do business in Texas" (Dkt. #19 at p. 5).  However, Schweda disagrees.  He states that he has "not solicit[ed] Texas residents to join [Elevacity]," and, therefore, "it cannot be said that [he] purposefully directed his activities to Texas residents" (Dkt. #6, Exhibit 1 ¶ 6; Dkt. #15 at p. 8).

Here, the Court finds Elevacity's argument unavailing.  Importantly, for specific jurisdiction, courts "look only to the contact out of which the cause of action arises . . . ." *Revell v.*

*Lidov*, 317 F.3d 467, 472 (5th Cir. 2002); *see also Bristol-Myers Squibbs Company v. Superior Court of California,* 137 S. Ct. 1773, 1781 (2017) ("[F]or a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy . . . When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.") (cleaned up).  And, here, Elevacity's tortious interference claim does not arise from Schweda's contact with Durant or Prather.  Indeed, these individuals do not provide a connection between Schweda, Texas, and the underlying controversy, and Elevacity has otherwise failed to allege or show that Schweda's alleged tortious conduct meaningfully connects him to Texas. *Cf. Danziger*, 24 F. 4th at 498 ("And because none of [defendant]'s allegedly tortious conduct meaningfully connects it to Texas, Texas courts do not have jurisdiction over [plaintiff]'s intentional tort claims.").  Accordingly, the Court finds that personal jurisdiction is lacking over Elevacity's intentional tort claim.

Nevertheless, because Elevacity also asserts a breach of contract claim against Schweda, the Court turns to examine whether it has personal jurisdiction over this claim. *See Seiferth v. Helicopteros Atuneros, Inc*., 472 F.3d 266, 274 (5th Cir. 2006).

## II.    Breach of Contract

Elevacity also brings a breach of contract claim against Schweda, asserting that it has made a *prima facie* showing that Schweda purposefully availed himself of Texas in connection with its breach of contract claim (Dkt. #13).  More specifically, Elevacity contends Schweda purposefully availed himself of the benefits of conducting business in Texas because he "knowingly associated with a Texas entity, initiated the relationship,[4] entered into another agreement with that Texas

---

[4] Schweda disputes this fact, asserting that "the evidence shows the opposite" (Dkt. #25 at p. 3).  Nonetheless, when evaluating a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, all conflicts of fact

entity, and visited Texas at least quarterly to attend events in Texas related to his work with Plaintiff" (Dkt. #24 at p. 1).  Further, Elevacity points specifically to the Amended Agreements' Texas choice of law and arbitration provisions, which "mak[e] clear that any dispute would be governed by Texas law and decided in Texas" (Dkt. #19 at p. 3).  In response, Schweda asserts that he does not have does not have the required minimum contacts in Texas because (i) the Amended Agreements were unilaterally imposed on him; (ii) the Amended Agreements do not mention anywhere that services will be rendered in Texas and, in fact, Schweda performed his services in Louisiana; and (iii) all the commissions that Schweda received under the Amended Agreements were sent to Louisiana where he resides (Dkt. #6 at pp. 5–6).[5]

In the context of business relationships, it is "well settled that 'an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum.'" *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 222–23 (5th Cir. 2012) (alteration in original) (quoting *Burger King*, 471 U.S. at 478).  Rather, "[a] 'highly realistic' approach is called for, recognizing that a contract is ordinarily but an intermediate step serving to tie up prior negotiations and future consequences which themselves are the real object of the business transaction." *Electrosource, Inc. v. Horizon Battery Techs, Ltd*. 176 F.3d 867, 872 (5th Cir. 1999).  Thus, when determining whether exercising personal jurisdiction over a breach of contract claim is proper, courts consider the "acts which relate to the

---

between the parties' affidavits and other evidence must be resolved in the plaintiff's favor. *Cent. Freight Lines*., 322 F.3d at 380.

[5] Schweda also asserts that the Amended Agreements are invalid because Elevacity did not comply with the amendment procedure in the Prior Agreements—namely, Elevacity did not "communicate[]" the Amended Agreements to him "through an 'official Company publication' that would have given Schweda notice of the contracts' '[a]mendments and changes . . .'" (Dkt. #15 at pp. 1–2).  In response, Elevacity asserts that it "complied with the Prior Agreements' amendment procedures by posting the Amended Agreements in [Schweda]'s Back-Office for more than 30 days" (Dkt. #19 at p. 2).  Accepting Elevacity's uncontroverted allegations as true and resolving all conflicts in its favor, the Court finds that the Amended Agreements are enforceable for purposes of considering personal jurisdiction. *See Alpine*, 205 F.3d at 215 ("[The Court] must accept as true th[e] [plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation.").

16

formation of the contract and the subsequent breach," including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Trois*, 882 F.3d at 489 (citations omitted).  "The ultimate question is whether the allegedly breached contract had a *substantial* relationship to the forum state, considering the totality of the circumstances." *Ecigrusa LLC v. Silver State Trading LLC*, No. 3:21-CV-1846, 2022 WL 1321573, at *4 (N.D. Tex. May 3, 2022) (emphasis in original).

On the one hand, Schweda asserts he performed his distribution services in Louisiana, and the commissions he received from his work with Elevacity were sent there (*see* Dkt. #6, Exhibit 1 ¶ 6).  And "where the contract is to be performed . . . is a weighty consideration." *Command–Aire Corp. v. Ontario Mech. Sales and Serv. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992).  Further, though Schweda admits to contracting with Elevacity and entering into the Prior Agreements, he contends that the Amended Agreements were unilaterally imposed on him without negotiations (Dkt. #6 at p. 5).  And "merely contracting with a resident of Texas is not enough to establish minimum contacts." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007).  Thus, viewed from this lens, Schweda's contacts with Texas appear to be sparse.  However, viewed from a different lens, the opposite appears to be true.

According to Elevacity, Schweda "initiated the relationship with [Elevacity], knowing it was based in Texas, and continued that relationship over a period of approximately over four years" (Dkt. #24 at p. 4).  Thus, according to Elevacity, "Schweda could have reasonably expected to be haled into a Texas court because he contracted with, and continuously did business with, a Texas company, even agreeing to resolve all disputes in this Court's geographical territory" (Dkt. #19 at p. 1).  So what explains these two very different pictures?  The parties' differing views on the effect of the Amended Agreements.

Indeed, Elevacity relies heavily on the Amended Agreements' existence to support its argument that personal jurisdiction is proper.  Conversely, Schweda significantly downplays their significance.  For example, Elevacity argues the Court has personal jurisdiction over its breach of contract claim "[b]ecause the provisions of the Amended Agreements create continuous obligations with a Texas resident, call for dispute resolution in Texas, and apply Texas law" (Dkt. #19 at p. 4).  Yet, Schweda asserts that the "provisions . . . do not overcome th[e] jurisdictional dispute" because that "Schweda may have known [Elevacity] was a Texas resident, which arguably could be implied through these provisions, [] is insufficient"[6] (Dkt. #15 at pp. 4–5).  The Court turns to resolve the crux of the parties' dispute—namely, whether the Amended Agreements provide the necessary minimum contacts between Schweda and Texas or whether, as Schweda contends, more is necessary for this Court to exercise jurisdiction.

Here, the Court finds that the terms and contemplated future consequences of the Amended Agreements, as well as the parties' actual course of dealing, indicate that Schweda purposefully availed himself of the benefits and protections of doing business in Texas and could reasonably anticipate being haled into court here.  First, it is undisputed that Schweda knew Elevacity was a Texas-based company when he began his relationship with it.  Nonetheless, "[i]t is well established that merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004).  However, Schweda also "had [] more than a fortuitous connection to Texas related to

---

[6] Schweda also contends, without citing any law, that the Independent Brand Partner Agreement, the Agreement that contains the Texas-related provisions, is not enforceable because though the Agreement states that Schweda's "obligation to be bound by this Agreement shall be effective by means of an electronic acceptance portal . . . ," he was never offered an "electronic acceptance portal" to click on (Dkt. #15 at p. 4).  Elevacity does not respond to this argument.  However, as stated previously, the Court finds that the Amended Agreements are enforceable for purposes of considering personal jurisdiction. *See Alpine*, 205 F.3d at 215 ("[The Court] must accept as true th[e] [plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation.").

a single transaction"—rather, he "entered into an ongoing business relationship with a Texas resident" and continued that relationship over approximately four years. *Latshaw v. Johnston*, 167 F.3d 208, 213 (5th Cir. 1999).

Moreover, the terms of the Amended Agreements support a finding of personal jurisdiction over Schweda—they contemplate significant involvement with Texas. *See Burger King*, 471 U.S. at 479 (finding it significant that the parties' dispute "grew directly out of a contract which had a *substantial* connection with that State.") (emphasis in original).  For example, Section 16 of the Independent Brand Partner Agreement provides:

> This Agreement shall be governed by the laws of the State of Texas without reference to its conflict of laws rules.  Except as set forth in the P&P, all claims and disputes relating to this Agreement, the rights and obligations of the parties, or any other claims or causes of actions relating to the performance of either party under this Agreement and/or Brand Partner's purchase of products shall be settled totally and finally by arbitration in Collin County, Texas, in accordance with the Federal Arbitration Act and the Commercial Rules of the American Arbitration Provision

(Dkt. #1, Exhibit 5 ¶ 16).  Further, the notice provision in Section 18 of the Independent Brand Partner Agreement ties the definition of "[b]usiness [d]ay" to a legal holiday in the State of Texas (Dkt. #1, Exhibit 5 ¶ 18).  Thus, notably, the Amended Agreements contain numerous provisions related to Texas that, at the very least, "indicate[] what future consequences [Schweda] [] should have contemplated when [he] contracted with [Elevacity]." *Gundle Lining Constr. Corp. v. Adams County Asphalt*, 85 F.3d 201, 206 (5th Cir. 1996).

Moreover, the Amended Agreements "include[] clauses addressing  disclosure of confidential information and a non-solicitation agreement," showing the parties "contemplated continuing obligations and wide-reaching contacts with Texas." *Transplace Texas, L.P. v. Higgins*, No. 4:10-CV-428, 2011 WL 623172, at *5 (E.D. Tex. Jan. 19, 2011).  Even more so, the Texas choice of law and arbitration provisions show Schweda "deliberate[ly] affiliat[ed] with the forum

State and [had] reasonable foreseeability of possible litigation there." *Burger King Corp.*, 471 U.S. at 482.  Indeed, as another sister court has noted, "[t]he combination of choosing Texas law and designating Texas as the arbitration forum . . . [strongly] support a finding that [defendant] anticipated and foresaw further contacts with Texas." *Gateway Logistics Grp., Inc. v. Dangerous Goods Mgmt. Australia Party, Ltd.*, No. H-05-2742, 2006 U.S. DIST. LEXIS 34931, at *20 (S.D. Tex. May 31, 2006); *see also Moncrief*, 481 F.3d at 313 (noting that Russian arbitration and choice of law clauses suggest intent was to keep undertaking within Russian jurisdiction).

To be sure, while a choice-of-law clause alone is not enough to establish personal jurisdiction, courts appear to weigh the clause as strong evidence of intent to either purposefully avail or not avail oneself of a forum. *See id.*, 471 U.S. at 482; *Freudensprung*, 379 F.3d at 345 ("The significance of these alleged minimum contacts is severely diminished by the fact that the contract at issue specified that it was to be governed by English law. . . ."); *Jones v. Petty–Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1069 (5th Cir. 1992) (suggesting that forum-selection and choice-of-law clauses "indicate rather forcefully" that defendant "did not purposefully direct its activities towards Texas"); *Pervasive*, 688 F.3d at 223 ("When combined with other factors, a choice-of-law clause may reinforce a conclusion that a defendant 'deliberate[ly] affiliat[ed] with the forum State and [had] reasonable foreseeability of possible litigation there.'").  Thus, the fact that Schweda entered into Agreements specifically invoking Texas law as the governing law powerfully indicates that Schweda has purposefully availed himself of the benefits and protections of Texas' laws.

Similarly, the Amended Agreements' arbitration provision pointing to dispute resolution in Texas "bolsters a finding for specific jurisdiction." *Timber Source, LLC v. Cahaba Valley Timber Co*, No. 06–9239, 2007 WL 891883, at *4 (E.D. La. Mar. 21, 2007); *see also*

*Electrosource*, 176 F.3d at 873 (finding that the parties' stipulation that Texas law was to apply to disputes settled by arbitration showed that that defendant purposefully invoked the benefits of Texas laws in one respect).  To be sure, the personal jurisdiction analysis focuses on whether the defendant could reasonably foresee being hailed into a Texas court.  And "[b]y agreeing to arbitrate in [Collin] [County], Texas, [Schweda] purposefully availed himself of the protections of Texas law and, accordingly, he could reasonably foresee being sued here." *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 398 (S.D. Tex. 2011).

In sum, Elevacity has established the minimum contacts necessary between Schweda and Texas so that Schweda is subject to personal jurisdiction in this forum for Elevacity's  breach of contract claim.  Indeed, the Court finds that Schweda has purposefully availed himself of the privilege of conducting activities within Texas by entering into an ongoing business relationship with a Texas-based entity and agreeing to Texas choice-of-law and arbitration provisions in furtherance of that relationship.

### III.     Fair Play and Substantial Justice

Since Elevacity has established that Schweda has the required minimum contacts with Texas in this litigation on its breach of contract claim, Schweda must now demonstrate that "asserting jurisdiction would offend traditional notions of fair play and substantial justice." *Hess v. Bumbo Int'l Tr.*, 954 F. Supp. 2d 590, 593 (S.D. Tex. 2013) (Costa, J).  Schweda "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477; *see Wien*, 195 F.3d at 215 ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant.").  Furthermore, because it is highly uncommon for an assertion of jurisdiction to be unfair once minimum contacts have been established, the "fair play and substantial justice"

factor should rarely be outcome determinative. *Blunt Wrap USA, Inc. v. Grabba-Leaf, L.L.C.*, No. CV 15-2764, 2016 WL 4547992, at *3 n.3 (E.D. La. Sept. 1, 2016).

Importantly, the Fifth Circuit has outlined a number of factors for courts to balance in determining whether the exercise of personal jurisdiction over a particular defendant is fair and reasonable, including: "(1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies." *Cent. Freight Lines Inc*., 322 F.3d at 384.

Here, though Schweda does not address the last three factors in his motion, he argues it would be unreasonable to litigate this action here because (i) it would be a "huge 'burden' on Schweda, and (ii) Texas does not have interest in the matter (Dkt. #6 at p. 8).  More specifically, Schweda asserts it would be a "huge 'burden'" to defend this case in Texas because he and most of the material witnesses are residents of Louisiana and "pay[ing] for these witnesses to travel over state lines and appear before a jury would be [] costly" (Dkt. #6 at p. 8).  Along the same lines, Schweda contends that Texas does not have an interest in resolving the matter because "most of the people who are alleged to have been wrongfully solicited reside outside of this State" (Dkt. #6 at p. 8).

The Court is unpersuaded by Schweda's arguments. First, Schweda has failed to identify any burdens outside of the basic inconvenience imposed on any party to litigation, such as having to travel to Texas for trial. *Conrad Shipyard, L.L.C. v. Franco Marine 1 LLC*, 431 F. Supp. 3d 839, 853 (E.D. Tex. Jan. 3, 2020).  Further, by contracting with Elevacity, a Texas company, and agreeing to Agreements that provided for Texas law with dispute resolution to take place in Texas,

Schweda should have reasonably foreseen that that he could be haled into Texas for his alleged tortious actions. *See McAfee, LLC v. Kinney*, No. 4:19-CV-463, 2019 WL 4077647, at *7 (E.D. Tex. Aug. 29, 2019).  And given the extent of Schweda's business dealings with Elevacity, litigation in Texas does not seem particularly burdensome.  Indeed, since beginning his work with Elevacity, Schweda has visited Texas at least quarterly to attend events in Texas related to his work.

Second, contrary to Schweda's argument otherwise, the interests of the forum state also favor personal jurisdiction over Schweda.  Though Schweda bases his argument on this factor on the fact that most of the people who are alleged to have been wrongfully solicited reside outside of the state, this case also concerns a Texas plaintiff and involves a contract governed by Texas law. *Higgins*, 2011 WL 623172, at *7; *see also Seisa Med., Inc. v. Asia Cap. Advisor, Ltd*., No. EP-18-CV-79, 2018 WL 5020226, at *11 (W.D. Tex. Sept. 20, 2018) ("Plaintiff's interest in securing relief in this case, where it has established Defendants' minimum contacts with Texas, also clearly favors personal jurisdiction, especially given that it filed this case in Texas and its principal place of business is in Texas.").  Accordingly, at the very least, Texas has a general, "manifest interest in providing effective means of redress for its residents." *McGee v. Int'l Life Ins. Co*., 355 U.S. 220, 223 (1957).

In sum, considering the relevant factors in light of the steep burden Schweda faces here, the Court finds that Schweda has not made out a compelling case that the Court's assertion of jurisdiction over it is unreasonable.  As such, it does not go against the interests of fair play and substantial justice to allow Texas, a state with which Schweda has sufficient minimum contacts, to exercise personal jurisdiction over Schweda for Elevacity's breach of contract claim.

## IV.    Pendent Personal Jurisdiction

Finally, even though the Court does not possess specific jurisdiction over Elevacity's tortious interference claim, pendent personal jurisdiction permits the Court to exercise jurisdiction over Schweda as to this claim. *See, e.g., In re Toyota Hybrid Brake Litig.*, No. 4:20-CV-127, 2021 WL 2805455, at *17 (E.D. Tex. July 6, 2021) (exercising pendent personal jurisdiction); *Nat'l Oil Well Varco, L.P. v. Sadagopan*, No. H-16-2261, 2017 WL 2957908, at *5–*6 (S.D. Tex. July 11, 2017) (asserting pendent jurisdiction over breach of contract claim after plaintiff had established personal jurisdiction on intentional tort claim); *Sedillo as Tr. of Filo and Fran Sedillo Revocable Tr. v. Team Techs., Inc*., No. 3:20-CV-1628, 2020 WL 6870711, at *5 (N.D. Tex. Nov. 23, 2020) (same); *Pension Advisory Grp., Ltd. v. Country Life Ins. Co*., 771 F. Supp. 2d 680, 696 (S.D. Tex. 2011) (same).

The concept of pendent personal jurisdiction "enables a court with in personam jurisdiction over a defendant to exercise that jurisdiction over all transactionally related claims against the same defendant, even where the court lacks an independent basis for personal jurisdiction over one or more related claims." *In re Toyota*, 2021 WL 2805455, at *17; *see also United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) ("[O]nce a district court has personal jurisdiction over a defendant for one claim, it may piggyback onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction.") (internal quotations omitted).  While the Fifth Circuit has not addressed pendent personal jurisdiction, district courts in the Fifth Circuit have embraced the concept.[7] *See, e.g., Sedillo as Tr. of Filo & Fran Sedillo Revocable Tr. v. Team*

---

[7] At its inception, pendent personal jurisdiction was typically employed in cases where the court had personal jurisdiction over a federal claim but lacked personal jurisdiction over related state law claims. *See, e.g., Soto v. Vanderbilt Mortg. & Fin., Inc*., No. C-10-66, 2010 WL 1790177, at *5–7 (S.D. Tex. May 3, 2010) (Jack, J.) (finding personal jurisdiction over plaintiffs' RICO claims and exercising pendent personal jurisdiction over plaintiffs' related

*Techs., Inc.*, No. 3:20-CV-1628-D, 2020 WL 6870711, at *5 (N.D. Tex. Nov. 23, 2020); *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 700 (E.D. Tex. 2020); *Halcyon Biomedical, Inc. v. Glatt Air Techniques, Inc*., No. CV H-19-690, 2019 WL 2420232, at *7 (S.D. Tex. June 10, 2019); *BidPrime, LLC v. SmartProcure, Inc*., No. 1:18-CV-478-RP, 2018 WL 5260050, at *4 (W.D. Tex. Oct. 22, 2018).  Moreover, other circuits to consider the issue have uniformly adopted and applied pendent personal jurisdiction. *See Pension Advisory*, 771 F. Supp. 3d at 696 (collecting out-of-circuit caselaw, which "uniformly approve[s] pendent personal jurisdiction").

Courts conduct a three-part analysis to ensure the propriety of pendent personal jurisdiction. *In re Toyota*, 2021 WL 2805455, at *17.  First, the Court must identify an "anchor" claim, *i.e*., a claim that allows a court to exercise personal jurisdiction over the defendant. *Mackzilla, LLC*, 2016 WL 1059529, at *5.  Next, the Court examines whether the anchor claim and the claim over which the court lacks an independent basis for personal jurisdiction "aris[e] out of the same nucleus of operative fact." *ESPOT*, 492 F. Supp. 3d at 700.  If yes, then the Court must determine whether entertaining the pendent claims against the defendant promotes "judicial economy, avoidance of piecemeal litigation[,] and the overall convenience of the parties." *Canyon Furniture Co. v. Rueda Sanchez*, No. SA-18-CV-00753-OLG, 2018 WL 6265041, at *13 (W.D. Tex. Nov. 8, 2018); *see In re Commonwealth Oil/Tesoro Petrol. Corp. Sec. Litig*., 467 F. Supp. 227, 247 (W.D. Tex. 1979) (Higginbotham, J.).  This final step—and, accordingly, the overall

---

state law claims); *Team Healthcare/Diagnostic Corp. v. Aetna Life Ins. Co*., No. A.3:07-CV-0214-O, 2008 WL 483366, at *7 (N.D. Tex. Feb. 22, 2008) (finding personal jurisdiction over plaintiff's ERISA claims and exercising pendent personal jurisdiction over plaintiff's related state law claims).  In those circumstances, the justification for the use of pendent personal jurisdiction was that a "defendant who already [was] before the court to defend a federal claim [was] unlikely to be severely inconvenienced by being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim." *Rolls-Royce Corp. v. Heros, Inc*., 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008).  However, over time, courts have employed the doctrine in diversity cases involving purely state law claims as well, concluding that the reasoning supporting pendent personal jurisdiction applies with "equal, or perhaps even greater, force" in these cases. *Gen. Elec. Cap. Corp. v. Mackzilla, LLC*, No. CV H-15-2425, 2016 WL 1059529, at *6 (S.D. Tex. Mar. 17, 2016).

decision to invoke pendent personal jurisdiction—is "within the court's discretion." *Rolls-Royce Corp.*, 576 F. Supp. 2d at 784; *see also Martin v. La. & Ark. Ry. Co.*, 535 F.2d 892, 894 (5th Cir. 1976) ("[T]he mere existence of power to adjudicate pendent claims does not mean that the exercise of that power is wise in every instance.").

As stated above, the Court has determined that Elevacity's breach of contract claim permits the Court to exercise personal jurisdiction over Schweda.  Thus, having identified an anchor claim, the Court turns to the second analytical step and examines whether this anchor claim and the claim which the Court lacks an independent basis for personal jurisdiction—the tortious interference with an existing contract claim—arise out of the same nucleus of operative fact.  While this Court has recognized that the "common nucleus of operative fact" concept is "somewhat protean," it has also found that claims generally derive from a common nucleus of operative fact when they are "so interrelated that plaintiffs would ordinarily be expected to try them all in one judicial proceeding." *In re Toyota*, 2021 WL 2805455, at *18 (internal quotations omitted); *see also Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (determining claims derive from a common nucleus of operative fact when they "concern the same core factual issue").  More concretely, courts have characterized claims derived from a common nucleus of operative fact as those "arising out of the same occurrence." *FDIC v. C.D. Henderson Inc.*, No. A-07-CA-982-SS, 2008 WL 11334958, at *3 (W.D. Tex. Oct. 31, 2008); *Mortell v. Mortell Co.*, 887 F.2d 1322, 1325 (7th Cir. 1989) (Easterbrook, J.) ("One series of related transactions is a single 'nucleus of operative facts.' All theories of liability concerning the same transaction or series of acts should be litigated in the same suit. . . .").

Here, an examination of the relevant facts quickly shows that Elevacity's tortious interference with an existing contract claim derives from the same nucleus of operative fact as the

anchor claim, the breach of contract claim.  Indeed, "[b]oth causes of action arise from the same alleged fact: [Schweda] allegedly posted impermissible content on Facebook." *Elevacity U.S., LLC v. McLean*, No. 4:22-CV-047, 2022 WL 3107891, at *1 (E.D. Tex. Aug. 3, 2022).   Thus, undoubtedly, the claims "arise out of the same occurrence." *FDIC*, 2008 WL 11334958, at *3. Consequently, the Court turns to the final analytical step and looks to whether judicial economy, the avoidance of piecemeal litigation, and the overall convenience of the parties would be served by the exercise of pendent personal jurisdiction against Schweda. *In re Toyota*, 2021 WL 2805455, at *18.

Here, the Court finds that keeping the pendent claim together with the anchor claim will promote these interests for two key reasons.  First, Schweda is already present in this action and must remain before the Court as a defendant to Elevacity's breach of contract claim. Therefore, the burden on Schweda to defend against the pendent claims is minimal. *Id*. Second, were the Court to decline to exercise pendent personal jurisdiction in this case, the parties would likely be forced to litigate the claims—which share a common nucleus of operative fact—in  a cross-jurisdictional, piecemeal fashion. *Id*.  Accordingly, this would necessarily require consideration by two courts of the same operative facts and would impose unnecessary expenses on the court system and the parties.  Moreover, "allowing such an outcome would run contrary to the justifications elemental to the doctrine of pendent personal jurisdiction." *Id*.  Therefore, taken together, considerations of judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties counsel the Court to wield its discretion and exercise pendent personal jurisdiction in this case.

## CONCLUSION

It is therefore **ORDERED** that Defendant's 12(b)(2) Motion to Dismiss (Dkt. #6) should

be **DENIED.**

**IT IS SO ORDERED**.

**SIGNED this 26th day of August, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE