# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| ELEVACITY U.S., LLC d/b/a THE HAPPY CO. f/k/a ELEPRENEURS U.S., LLC d/b/a ELEPRENEURS, LLC, § § § § *Plaintiff,* § § v. § § BRIAN CHRISTOPHER SCHWEDA, JR., § § *Defendant.* | Civil Action No. 4:22-CV-00042 Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Brian Christopher Schweda's 12(b)(6) Motion to Dismiss (Dkt. #10). Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

### BACKGROUND

This case arises out of the business relationship between Plaintiff Elevacity U.S., LLC d/b/a The Happy Co., f/k/a Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC ("Elevacity") and Defendant Brian Christopher Schweda, Jr. ("Schweda"). Elevacity sells and markets "various health, wellness and happiness products and services through a direct sales community of independent contractors[,]" also known as distributors or brand partners (Dkt. #1 ¶ 8). Elevacity's distributors market and sell the company's products and "recruit additional individuals into the Elevacity Distributor system to further promote and sell products and services to" potential customers (Dkt. #1 ¶ 9).

### I. Schweda Joins Elevacity and Agrees to Elevacity's Agreements

On October 4, 2018, Schweda agreed to and accepted three essential documents (pursuant to an electronic verification system process) governing his work with Elevacity: (i) the Elepreneur Agreement; (ii) the Policies and Procedures of Eleprenuers LLC, and (iii) the Elepreneurs Social Media and Online Policy Guide (collectively, the "Prior Agreements") (Dkt. #1 ¶ 13). To accept and agree to the Prior Agreements, distributors, including Schweda, underwent the following standard process: (i) logging in to the Elevacity computer system to access the distributor's "Back-Office";[1] (ii) reading the Prior Agreements; and (iii) manually agreeing to the Prior Agreements by clicking the mouse to place a check-mark in a box accepting all of the terms and conditions of the Prior Agreements (Dkt. #1 ¶ 14). If a distributor did not complete this process, then that distributor would not be able to proceed to access their Back-Office (Dkt. #1 ¶ 14).

#### A. The Prior Agreements Are Amended

The Policies and Procedures of Elepreneurs, LLC stated that, "[a]mendments and changes will be communicated to Elepreneurs through official Company publications, including posting on the website or by electronic mail. Amendments are effective and binding on all Elepreneurs five days after publication" (Dkt. #1, Exhibit 2 at p. 36). According to Elevacity, it "considered posting on 'the website or by electronic mail' to include posting to a distributor's Back-Office" (Dkt. #1 ¶ 15). In 2021, Elevacity posted its Independent Brand Partner Agreement and Policies and Procedures (collectively, the "Amended Agreements") to its distributors' Back-Offices (Dkt. #1 ¶ 17).

The Amended Agreements contain various provisions stating that Elevacity's distributors (i) cannot solicit other distributors to leave Elevacity or otherwise terminate their relationship with

---

[1] At Elevacity, Back-Office is the primary portal for distributors to order more product and keep track of sales figures (Dkt. #1 ¶ 14).

Elevacity, (ii) use a social media site to draw inquiries from other distributors about a new network marketing company, or (iii) disparage Elevacity by making negative comments (Dkt. #1 ¶ 19). For example, under section 12 of the Independent Brand Partner Agreement, distributors are prohibited, while they are distributors for Elevacity and for twelve months afterward, from recruiting any other Elevacity distributor for any other direct selling or network marketing business (Dkt. #1, Exhibit 5 ¶ 12). Under the Agreement, "recruit" includes: (i) "communicating information or offering to provide information about another direct selling, network marketing, or social selling business" to another Elevacity distributor; (ii) "posting or messaging information" about such a company on a social media site the distributor has also used to promote their Elevacity business; (iii) or "tagging" other Elevacity distributors in such posts (Dkt. #1, Exhibit 5 ¶ 12). Additionally, during this same term, distributors may not use such social media accounts in any way that may "reasonably be foreseen" to draw inquiries from other Elevacity distributors to other direct selling or network marketing businesses or products (Dkt. #1, Exhibit 5 ¶ 12).

### B. Schweda's Work with Elevacity and Subsequent Resignation from the Company

After enrolling as a distributor for Elevacity, Schweda allegedly used his Facebook page to conduct his business—both marketing Elevacity products and recruiting additional distributors through the platform (Dkt. #1 ¶ 18). Many different distributors followed and interacted with Schweda through his Facebook, and several current and former distributors continue to follow and interact with him on his Facebook page (Dkt. #1 ¶ 18). Schweda operated his distributorship with Elevacity until December 17, 2021, the date on which he resigned (Dkt. #1 ¶ 20). Following Schweda's resignation, Schweda allegedly began marketing and promoting different products, including an "energizing" coffee product, on social media (Dkt. #1 ¶ 21). More specifically, Elevacity alleges that Schweda made a variety of Facebook posts, which were aimed at promoting

his new marketing venture (Dkt. #1 ¶ 27). Further, according to Elevacity, former Elevacity distributors commented on the posts and joined Schweda's new venture (Dkt. #1 ¶¶ 22–27).

On January 20, 2022, Elevacity filed suit against Schweda, asserting claims for breach of contract and tortious interference with existing contracts (Dkt. #1). On March 12, 2022, Schweda filed his 12(b)(6) motion to dismiss, arguing that Elevacity's tortious-interference claim should be dismissed (Dkt. #10). On March 29, 2022, Elevacity filed its response (Dkt. #14). Shortly after, Schweda filed his reply (Dkt. #16), and Elevacity filed its sur-reply (Dkt. #20).

## LEGAL STANDARD

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600,

4

603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

Schweda asserts that Elevacity's tortious-interference claim should be dismissed for two reasons. First, he contends that Elevacity has not alleged that other distributors breached their Amended Agreements, and thus it has not plausibly stated a claim for tortious interference. Second, he argues that the economic loss rule bars Elevacity's recovery.

The Court address each argument in turn.

5

### I.  Plaintiff Sufficiently Alleged its Tortious Interference Claim

Schweda first claims that Elevacity fails to plausibly allege a tortious-interference claim. Under Texas law, a party claiming tortious interference with an existing contract must show: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009, pet dism'd). The second element, a willful and intentional act of interference with the contract, requires proof that the defendant caused a third party to breach a contract. *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017); *WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 354 (5th Cir. 2021), *as revised* (Mar. 2, 2021) (reviewing *El Paso Healthcare Sys., Ltd. v. Murphy* and concluding that "without sufficient proof that the defendant's conduct resulted in some obligatory provision of a contract having been breached, the plaintiff's tortious interference claim is infirm as a matter of law") (internal quotations and citations omitted).

Latching onto this second element, Schweda argues Elevacity's complaint lacks any allegations that other distributors breached their agreements with Elevacity. Therefore, the tortious-interference claim fails as a matter of law. However, the Court disagrees. After reviewing the current complaint, and the arguments contained in the briefing, the Court finds that Elevacity has stated a plausible claim for relief.

### II.  The Economic Loss Rule Does Not Bar Plaintiff's Recovery

Alternatively, Schweda argues that the economic loss rule bars Elevacity's tortious-interference claim. But the Court is unpersuaded.

Texas courts follow the economic loss rule, which "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (citing *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 242 (Tex. 2014)). "Under the rule, if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may sound in both tort and contract, but if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, 192 S.W.3d 120, 126–27 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

That said, the economic loss rule does not apply in every contractual scenario. *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718. Indeed, "a party cannot avoid tort liability to the world simply by entering into a contract with one party otherwise the economic loss rule would swallow all claims between contractual and commercial strangers." *Id.* (cleaned up) (citing *Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 419 (Tex. 2011)). The Supreme Court of Texas has noted several different tort actions where the economic loss rule does not automatically apply, including tortious-interference claims. *Sharyland Water Supply Corp.*, 354 S.W.3d at 418–19.

Thus, to determine if the rule applies to a particular set of circumstances, courts consider two factors: "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Crawford v. Ace Sign, Inc.,* 817 S.W.2d 12, 13 (Tex. 1996). A plaintiff states a claim when the allegations show that the defendant breached an independent duty separate from the contract, and

7

"the harm suffered was not merely the economic loss of a contractual benefit." *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718 (citations omitted). The Court does not "look to the manner in which [the] cause of action was [pleaded]," rather it must "look to the substance of the cause of action." *Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 909 (Tex. App.—San Antonio 2019, no pet.) (cleaned up). "One helpful rule of thumb in discerning whether the defendant's conduct constitutes an independent tort is to inquire whether, if the defendant fully complied with the contract, the plaintiff could still sue under tort." *Nat'l Rifle Ass'n of Am. v. Ackerman Mcqueen, Inc.*, No. 3:19-CV-2074, 2021 WL 3618113, at *18 (N.D. Tex. Aug. 16, 2021) (citing *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 726 (5th Cir. 2015)). If the plaintiff could not, then the party must sue in contract. *Id.*

Schweda contends that the economic loss rule applies here because Elevacity does not allege a breach of an independent duty. Specifically, Schweda suggests that Elevacity's tortious-interference claim is predicated on Schweda breaching the social-media and non-solicitation provisions in the Amended Agreements. These provisions generally provided that Schweda could not solicit other distributors to leave Elevacity or use a social media site to draw inquiries from other distributors about a new network marketing company (Dkt. #1, Exhibit 6 at pp. 4, 8–9). In Schweda's view, the economic loss rule then steps in because a contractual duty cannot form the basis for Elevacity's tortious-interference cause of action. *See Chapman Custom Homes, Inc.*, 445 S.W.3d at 718; *Exxon Mobil Corp.*, 192 S.W.3d at 126–27.

But Elevacity's tortious-interference claim does not hinge on Schweda breaching the Amended Agreements or any of the provisions therein. Elevacity alleged in its complaint:

> Defendant willfully and intentionally acted to interfere with [other distributors'] contracts by soliciting Plaintiff's employees, contractors, or distributors, to work for Defendant's competing company. Defendant knew his actions would result in the termination of the valuable contractual relationships by Plaintiff and its

>independent contractor distributors, which in fact, did occur as demonstrated in detail above.

(Dkt. #1, ¶ 34). Put another way, Elevacity alleges that—independent of any contractual arrangement—Schweda interfered with Elevacity's other contracts by soliciting its distributors to work for his venture. Therefore, at this juncture, the Court is satisfied that Elevacity has plausibly alleged the breach of a duty separate from the parties' contractual undertaking. *See Chapman Custom Homes, Inc.*, 445 S.W.3d at 718; *Sting Soccer Operations Group LP v. JP Morgan Chase Bank, N.A.*, No. 4:15-CV-127, 2016 WL 3917640, at *8 (E.D. Tex. July 20, 2016) (concluding the plaintiff plausibly alleged that the defendant breached an independent duty when it alleged that "[d]efendant knew of the relationship between the [p]laintiff and its customers" and the "[d]efendant knew that interference with such relationships was certain or substantially certain to occur as a result of its conduct"). Accordingly, the economic loss rule does not apply.

To be sure, Schweda's conduct may very well constitute a breach of the non-solicitation and social-media provisions in his own Amended Agreements. It appears Elevacity's breach-of-contract claim and its tortious-interference claim arise from the same set of operative facts—specifically, Schweda's posts on social media and encouraging other Elevacity distributors to join his venture. However, that does not absolve Schweda of his *independent* duty to refrain from interfering with *other* third-party contracts. *See CoreALM, LLC v. Keen Fusion, Inc.*, No. 03-17-00707-CV, 2018 WL 6072154, at *3 (Tex. App.—Austin Nov. 21, 2018, pet. denied) ("The duty not to interfere with another's contractual relationship arises out of the law and is independent of any contractual relationship between the interfering party and the party whose contractual relationship with a third party has been interfered with."); *see also Am. Nat. Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 279 (Tex. 1990) ("A knowing and intentional breach of one's direct contract may also be an act tortiously interfering with a third party's contract,

9

if it is done with a purpose and effect of preventing the third party from performing its contract with another."). Schweda has not cited a case, nor has the Court found one, where the parties' contract otherwise swallowed this duty. Indeed, case law suggests otherwise. *See CoreALM, LLC*, 2018 WL 6072154, at *3 ("Implicit in [the defendant's] argument is the assumption that the duty not to interfere with [the plaintiff's] contract with [a third party] arose solely out of the [plaintiff and defendant's agreement], and was not a duty imposed by law. We disagree."). Accordingly, the Court finds that Elevacity has alleged the breach of an independent duty, and the economic loss rule does not apply to these particular circumstances.

The Court's conclusion is reinforced by the fact that Elevacity seeks different remedies than merely recovering the value of its contract with Schweda. *See Crawford,* 817 S.W.2d at 13 (instructing courts to look to the nature of the remedy sought for the economic loss rule); *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 387 (Tex. 2011) ("Further, under the economic loss rule, we have held that a claim sounds in contract when the only injury is economic loss *to the subject of the contract itself*.") (emphasis added). Here, Elevacity alleges it suffered independent harm under its agreements with other distributors—not just losses associated with its contract with Schweda. *See* (Dkt. #1, ¶ 34) ("Defendant knew his actions would result in the termination of valuable contractual relationships by Plaintiff and its independent contractor distributors . . . ."). Therefore, the Court is persuaded that Elevacity is not merely repackaging a breach of contract claim as one for tortious interference. The economic loss rule does not bar this sort of claim.

## CONCLUSION

It is therefore **ORDERED** that Brian Christopher Schweda's 12(b)(6) Motion to Dismiss (Dkt. #10) is **DENIED.**

**SIGNED this 12th day of October, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE